471-09/MEU
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
NORDEN
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Michael E. Unger

**'09 CIV 6294**



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
DAMPSKIBSSELSKABET NORDEN AS,

       Plaintiff,

     -against-

SHIPPING-LAND CO. LTD., SHIPPING-LAND
(SINGAPORE) PTE LTD., DREAMSHIP PTE
LTD., SHIPLAND CORP., S SHIP CO. LTD. and
SPRING-TECH CO. LTD.,

       Defendants.

-------------------------------------------------------------x

**09 cv  ( )**

**VERIFIED COMPLAINT**

   Plaintiff, DAMPSKIBSSELSKABET NORDEN AS, ("NORDEN"), by its

attorneys Freehill, Hogan and Mahar, LLP., as and for its Verified Complaint against

Defendants SHIPPING-LAND CO. LTD., ("SHIPPING-LAND") SHIPPING-LAND

(SINGAPORE) PTE LTD., ("SLS") DREAMSHIP PTE LTD., ("DREAMSHIP"),

SHIPLAND CORP. ('SHIPLAND"), S SHIP CO. LTD. ("S SHIP") and SPRING-TECH

CO. LTD. ("SPRING-TECH") alleges as follows:

   1.  This is an admiralty and maritime claim within the meaning of Rule 9(h)

of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a

maritime contract. This case also falls under this Court's admiralty and maritime

NYDOCS1/333629.1      1

jurisdiction pursuant to 28 U.S.C. §1333 and the Court's federal question jurisdiction pursuant to 28 U.S.C. §1331. Federal jurisdiction also exists because the action arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2.      At all times material hereto, Plaintiff NORDEN was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 49, Amaliegade, DK-1256, Copenhagen, Denmark.

3.      At all times relevant hereto, Defendant SHIPPING-LAND was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 9F Donghwa Bldg. 58-7, Seosoian Dong, Juang-Ku Seoul, 100-736 Korea.

4.      At all times relevant hereto, Defendant SLS was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 460 Alexandra Road, 05-01B, PSA Building 119963, Singapore.

5.      At all times relevant hereto, Defendant DREAMSHIP was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 460 Alexandra Road, 05-01B, PSA Building 119963, Singapore.

6.      At all times relevant hereto, Defendant SHIPLAND was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 460 Alexandra Road, 05-01B, PSA Building 119963, Singapore.

7.      At all times relevant hereto, Defendant S SHIP was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an

address at Room 904, Haedoek Building, 1212-11 Choryang-Dong, Dong-gu, Busan, Korea.

8.    At all times relevant hereto, Defendant SPRING-TECH was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at #410, 1640, Sangam-dong, Mapo-gu, Seoul, 121-270 Korea.

## COUNT 1
## (Against Defendant SHIPPING-LAND CO. LTD.)

9.    Pursuant to a maritime contract of charter dated May 2, 2008 on an Amended NYPE 1993 From, SHIPPING-LAND as disponent owner agreed to let the vessel M/V MEGALOHARI to Plaintiff NORDEN for a period of a minimum of 12 to about 14 months (about meaning 15 days more or less in NORDEN's option).  A copy of the charter is attached hereto as Exhibit A.

10.    The vessel is not, in fact, owned by SHIPPING-LAND.  Rather non-party Hanjin Shipping Co. Ltd. of Korea ("Hanjin") which had previously entered into a similar time charter agreement with the vessel's actual owner had sub-chartered the vessel to SHIPPING-LAND whereby Hanjin agreed to allow SHIPPING-LAND to use the vessel for a set period of time at an agreed charter hire rate.

11.    Pursuant to a sub-charter dated June 19, 2009, NORDEN agreed to carry a cargo of coal from Dalrymple Bay in Australia aboard the M/V MEGALOHARI to ports in India at an agreed freight rate on behalf of Steel Authority of India Limited ("SAIL").

12.    Under the sub-voyage charter with SAIL, NORDEN agreed that the vessel would arrive at Dalrymple Bay in Australia and tender notice of readiness to load cargo between July 3-13, 2009.

13.    Pursuant to NORDEN's instructions, the M/V MEGALOHARI departed Weosu, South Korea on June 25, 2009 and proceeded to Dalrymple Bay.

14.    The vessel arrived at Dalrymple Bay and tendered notice of readiness to load the cargo at 0436 hours local time on July 6, 2009 (1836 hours GMT on July 5, 2009).

15.    The vessel has been delayed in berthing due to congestion at the load port.

16.    In the meantime, on July 9, 2009 NORDEN was notified by the vessel's Master that as the apparent result of Defendant SHIPPING-LAND having failed to pay outstanding hire to Hanjin within the time required under the charter between Hanjin and SHIPPING-LAND, Hanjin accepted the conduct of SHIPPING-LAND as being in repudiatory breach thus bringing that charter to an end.

17.    As SHIPPING-LAND no longer has rights to the vessel, it is in breach of the charter with NORDEN and NORDEN has been put in a position whereby it is unable to make use of the vessel in order to perform the pending sub-voyage charter with SAIL and will also lose the ability to use the vessel for the remaining contracted period up to December 17, 2009.

18.    NORDEN is diligently attempting to make arrangements for an alternative vessel to perform the sub-voyage charter with SAIL and/or to charter the vessel directly from Hanjin on a period time charter basis.

19.    To date, no agreement has been reached with Hanjin.

20.    The voyage charter with SAIL was expected to have a total duration of 55.41 days, including congestion at the loading port of Dalrymple Bay.

21.    NORDEN had been paying SHIPPING-LAND the sum of $14,052.50 net daily hire for the vessel.

22.    NORDEN calculated that the time charter equivalent rate under the sub-charter with non-party SAIL as $25,136.84 per day.

23.    Accordingly, NORDEN's anticipated net profit on the sub-voyage charter with SAIL was expected to be $614,183.28 ($25,136.84 - $14,052.50 x 55.41 days).

24.    NORDEN further estimates that under the period from August 20 (when the SAIL charter would have reasonably been expected to have concluded) until December 17, 2009 (the maximum time under which NORDEN could use the vessel under the charter with SHIPPING-LAND) NORDEN would have earned an approximate profit of $5,500 per day.

25.    Accordingly, for the 117 day balance period following conclusion of the SAIL fixture Hanjin calculates a further loss of $643,500 in profit.

26.    Additionally, prior to Hanjin canceling the charter with Defendant SHIPPING-LAND, NORDEN had provided and paid for 1290 metric tons of bunkers (marine fuel) valued at $495 per ton aboard the vessel.

27.    As a result of Defendant SHIPPING-LAND's breach of the charter by failing to ensure continued use and operation of the vessel so that it could continue to

sub-charter the ship to NORDEN, NORDEN has sustained a further loss for the bunkers of $638,550.00.

28.    As a result of Defendant SHIPPING-LAND's breach of the charter, NORDEN, as best as can be presently estimated, has sustained damages in the sum of $1,896,233.28 which has been duly demanded but remains unpaid.

29.    NORDEN is currently attempting to arrange for alternative vessel to perform the pending sub-voyage charter with SAIL.  To the extent that the substitute vessel is more costly than the M/V MEGALOHARI, NORDEN reserves the right to claim additional damages from Defendant SHIPPING-LAND for these losses as well.

30.    The charter between NORDEN and SHIPPING-LAND is governed by English Law and provides for arbitration in London of any claim or dispute arising thereunder.

31.    Under English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs including attorney fees, arbitrators' fees, disbursements and interest are recoverable as an element of Plaintiff's claim.

32.    Plaintiff estimates, as nearly as can presently be computed, that the legal expenses and costs of prosecuting its claims in London arbitration will be $250,000.

33.    Interest anticipated to be awarded on the principal sums now due to Plaintiff is estimated to be $239,859.00 (calculated at the rate of 6% per annum compounded quarterly for a period of 2 years, the estimated time for completion of the proceedings in London).

34.    In all, the claim for which Plaintiff sues in this action, as near as presently may be estimated, totals **$ 2,386,092.00.**

### COUNT 2
### (Against Defendants Shipping-Land (Singapore) Pte Ltd., Dreamship Pte Ltd., and Shipland Corp.)

35.     Plaintiff repeats and realleges the allegations of paragraphs 1 - 34 above as if set forth herein in full.

36.     SHIPPING-LAND is a mid-sized South Korean company that in January 2009 managed a fleet of 12 vessels of which two were directly owned under its name. Its President is H. S. Lee who as of January 2009 owned 77.8% of the company's shares.

37.     At the beginning of 2008, SHIPPING-LAND established a number of companies in Singapore including Defendants SLS, DREAMSHIP and SHIPLAND (hereinafter, the "Singapore defendants").

38.     Upon information and belief, the Singapore defendants are not separate, independent identities from SHIPPING-LAND, and vice versa.

39.     Upon information and belief, SHIPPING-LAND dominates and disregards the corporate form of the Singapore defendants in that SHIPPING-LAND uses the Singapore defendants to carry out SHIPPING-LAND's business and operations and the Singapore defendants have no independent existence of their own but rather exist solely to carry out SHIPPING-LAND's business and operations as its alter egos.

40.     Defendants SLS, DREAMSHIP, SHIPLAND and S SHIP were formed by SHIPPING-LAND to take advantage of the tax benefits of being located in Singapore and sheltering SHIPPING-LAND's assets from attachment or arrest.

41.     The Singapore defendants were further formed to allow SHIPPING-LAND to send and receive wire transfers under a name other than its own and thus avoid any possible attachments under Rule B or otherwise.

42. The Singapore defendants cannot be found to be doing any business of their own or to have any assets of their own. They exist as shell corporations of SHIPPING-LAND, and the money they send and receive is not theirs but that of SHIPPING-LAND.

43. The formation of the Singapore defendants has allowed SHIPPING-LAND to continue operating and to move money through bank wire transfers without risk of attachment despite the existence of maritime claims against it in this Court.

44. With respect to defendant SLS, Judge Sand issued an order on February 4, 2009 in the Rule B case of Makeba Marine v. Shipping Land Co. Ltd., Shipping-Land Co. Ltd., Shipping Land (Singapore) Pte Ltd., Shipland Corporation Pte and Dreamship Pte Ltd. (08 Civ. 9376) denying a motion by Shipping-Land (Singapore) Pte Ltd. to dismiss the Rule B complaint for failure to prove alter ego. A copy of Judge Sand's order is attached hereto as Exhibit B. As far as can be discerned from the court's electronic docket, none of the other defendants in that case made a motion to dismiss.

45. In January 2009 SHIPPING-LAND had already had its assets frozen by a South Korean court order for non-payment of brokerage commissions.

46. Each of the Singapore defendants was incorporated with share capital of only Singapore $2.00 (approximately $1.37 at the current rate of exchange.) SLS and Dreamship were incorporated on February 15, 2008 and SHIPLAND on October 16, 2008, originally named "Shipping-Land Corporation Pte Ltd."

47. Each of the Singapore defendants has Mr. Park Chang Heui as a shareholder and serving as a director. In addition, SLS and Dreamship also both have Mr. Park Hayong as a shareholder and serving as a director.

48.  Each of the Singapore defendants share the same registered address.

49.  Corporate investigators report that Mr. Park Chang Heui is holding himself out in the shipping community as the representative of SHIPPING-LAND.

50.  On a number of occasions SLS remitted charter hire payments on behalf of the Korean based SHIPPING-LAND.

51.  DREAMSHIP has the same shareholders, officers, and office address as SLS and has also been used as a payment agent under charters entered into with SHIPPING-LAND.

52.  Despite that the charter was entered into between NORDEN and Defendant SHIPPING-LAND, the charter provided that payment of hire was to be made to Defendant DREAMSHIP.

53.  As a result of the foregoing, Plaintiff hereby claims against the Singapore defendants for the damages described in Count 1 above.

54.  This action seeks security for the claims against the Singapore defendants.

55.  The Singapore defendants cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

56.  Upon information and belief, the Singapore defendants have or will have during the pendency of this action, assets within this district and subject to the jurisdiction of this Court including, but not limited to, assets held in the hands of garnishees.

57.  Plaintiff seeks an order from this Court directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the

Supplemental Admiralty Rules attaching, *inter alia*, any assets including electronic funds transfers of the Singapore defendants held. by any garnishee in the district for purpose of obtaining personal jurisdiction over the Singapore defendants and to secure its claim.

58.    There is no statutory or maritime bar to the attachment sought herein.


## COUNT 3
**(Against defendant S Ship Co, Ltd.)**

59.    Plaintiff repeats and realleges the allegations of paragraphs 1-58 above as if fully set forth herein.

60.    Defendant S SHIP was formed in Korea as a limited liability company by the president of SHIPPING-LAND in February of 2009.  Public records show that the president of SHIPPING-LAND is also the president of S Ship.

61.    Since forming S SHIP, SHIPPING-LAND has transferred at least two of its ships to S SHIP which then renamed them.

62.    S SHIP has been appointed to act as a third party manager of eight of the vessels formerly managed by SHIPPING-LAND including the two registered to be directly owned by SHIPPING-LAND.

63.    S SHIP operates from the Busan office address that is listed as a branch office for SHIPPING-LAND.

64.    The sole purpose for the formation and operation of S SHIP is to allow SHIPPING-LAND to evade Rule B attachments by carrying on in the name of S SHIP business intended to ultimately benefit only SHIPPING-LAND; and to allow SHIPPING-LAND to send and receive money other than in its own name so as to evade Rule B

process which would issue only against property (including electronic funds transfers) of SHIPPING-LAND.

65.    The formation of S SHIP has allowed SHIPPING-LAND to continue operating and to move money through bank wire transfers without risk of attachment despite the existence of maritime claims against it in this Court.

66.    Upon information and belief, S SHIP is not a separate, independent identity from SHIPPING-LAND, and vice versa.

67.    Upon information and belief, S SHIP is an alter-ego of SHIPPING-LAND as SHIPPING-LAND dominates and disregards the corporate form of S SHIP in that SHIPPING-LAND uses S SHIP to carry out SHIPPING-LAND's business and operations, and S SHIP has no independent existence of its own.

68.    As a result of the foregoing, Plaintiff claims against S SHIP for the damages set forth in Count 1 above.

69.    This action seeks security for the claims against S SHIP.

70.    S SHIP cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

71.    Upon information and belief, S SHIP has or will have during the pendency of this action, assets within this district and subject to the jurisdiction of this Court including, but not limited to, assets held in the hands of garnishees.

72.    Plaintiff seeks an order from this Court directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Admiralty Rules attaching, *inter alia*, any assets of S SHIP including

electronic funds transfers held by any garnishee in the district for purpose of obtaining personal jurisdiction over S Ship and to secure its claim.

73.    There is no statutory or maritime bar to the attachment sought herein.

## COUNT 4
### (Against the Singapore defendants and S Ship)

74.    Plaintiff repeats and realleges the allegations of paragraphs 1-73 above as if fully set forth herein.

75.    The Singapore defendants and S SHIP act as paying agents, or receiving agents, with regard to the debts and obligations of SHIPPING-LAND.

76.    SHIPPING-LAND uses the Singapore defendants and S SHIP as "pass through entities" to try to insulate SHIPPING-LAND from creditors relating to its commercial obligations.

77.    It is not common practice in the maritime industry for an independent company to pay another company's debts.

## COUNT 5
### (Against the Singapore defendants and Spring-Tech)

78.    Plaintiff repeats and realleges the allegations of paragraphs 1-77 above as if fully set forth herein.

79.    SPRING-TECH is a Korean company which also serves as a paying agent and/or is the alter ego of Defendant SHIPPING-LAND.

80.    Pursuant to Addendum No. 3 to the charter between NORDEN and SHIPPING-LAND, NORDEN was directed to remit hire payments due under the charter to SPRING-TECH's account at Korea Exchange Bank.

81.    Said direction was for the sole purpose of allowing SHIPPING-LAND to continue operating and to move money through bank wire transfers without risk of attachment despite the existence of maritime claims against it in this Court.

82.    Upon information and belief SPRING-TECH is not a separate, independent entity from SHIPPING-LAND and vice versa.

83.    Upon information and belief, SPRING-TECH is an alter-ego of SHIPPING-LAND as SHIPPING-LAND dominates and disregards the corporate form of SPRING-TECH in that SHIPPING-LAND uses SPRING-TECH to carryout SHIPPING-LAND's business and operations and SPRING-TECH has no independent existence of its own.

84.    As a result of the foregoing, Plaintiff claims against SPRING-TECH for the damages set forth in Court 1 above.

### Request for Rule B Relief

85.    Upon information and belief, and after investigation, the Defendants cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendants have, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire or any other assets of, belonging to, due or being transferred for the benefit of the said Defendants SHIPPING-LAND CO. LTD., SHIPPING-LAND (SINGAPORE) PTE. LTD., DREAMSHIP PTE LTD., SHIPLAND CORP. and S SHIP CO. LTD. (collectively

hereinafter, "ASSETS"), including but not limited to ASSETS as may be held, received or transferred in their names or for their benefit, at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

86.    The total amount to be attached pursuant to the calculations set forth above is **$2,386,092.00.**

WHEREFORE, Plaintiff prays:

a.    That process in due form of law according to the practice of this Court may issue against Defendants citing them to appear and answer the foregoing;

b.    That if Defendants cannot be found within this District pursuant to Supplemental Rule B all tangible or intangible property of Defendants up to and including the sum of **$2,386,092.00** be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due, held or being transferred to or for the benefit of Defendants, at, moving through or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c.    That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary, including but not limited to an order compelling the Defendants to arbitrate and/or the recognition

and enforcement of any award or judgment entered against the Defendants

in the London arbitration proceedings; and

d.    For such other, further and different relief as this Court may deem just and

proper.

Dated: New York, New York
       July 14, 2009                    FREEHILL HOGAN & MAHAR, LLP
                                        Attorneys for Plaintiff
                                        DAMPSKIBSSELSKABET NORDEN AS


                                        _____
                                        Michael E. Unger
                                        80 Pine Street
                                        New York, NY 10005
                                        (212) 425-1900
                                        (212) 425-1901 fax

# Exhibit A



BIDSTED & CO. A/s
SHIPBROKERS
18, TUBORG HAVNEVEJ · DK-2900 HELLERUP
Telephone (+45) 39 29 88 22 · Telefax (+45) 39 29 88 99
WWW.BIDSTED.DK

5990

Code Name: "NYPE 93"

**WORKING COPY**

Recommended by:
The Baltic and International Maritime Council (BIMCO)
The Federation of National Associations of
Ship Brokers and Agents (FONASBA)

## TIME CHARTER®

New York Produce Exchange Form
*Issued by the Association of Ship Brokers and Agents (U.S.A.), Inc.*

November 6th, 1913 – Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946;
Revised June 12th, 1981; September 14th 1993.

THIS CHARTER PARTY, made and concluded in Copenhagen                          1
this 2nd day of May 1 2008                                                    2

Between Shipping Land Co., Ltd. as disponent                                  3

<u>Owners</u> or their fully guaranteed Nominee of the Vessel described below, and Dampskibsselskabet Norden   4
A/S, Copenhagen as                                                           5

                                                                             6
<u>Charterers</u> or their fully guaranteed Nominee.                         7
                                                                             8

**Description of Vessel**                                                    9

Name "MEGALOHARI" (EX "PATRIZIA D'AMATO") Flag Cyprus Built June, 2004(year). 10
Port and number of Registry Cyprus                                          11
Classed BV in                                                              12
Deadweight 76,633 ~~long~~*/metric* tons (cargo and bunkers, excluding ~~including~~ freshwater and   13
stores not exceeding 223 ~~long~~*/metric* tons based on "loading manual") on a salt water draft of 14.14 metres   14
on summer freeboard.                                                        15

Capacity 3,204,495 cubic feet grain        ~~cubic feet bale space.~~        16
Tonnage 39,727/25,354 GRT/NRT ~~GT/GRT~~.                                   16
Speed about 14.3/14.8 knots, fully laden/ballast, in good weather conditions up to and including maximum   17
Force 4 on the Beaufort wind scale, on a consumption of about 35.0/32.0 ~~long~~*/metric*   18
tons of Intermediate Fuel Oil plus 2.0 metric tons Intermediate Fuel Oil - See also Clause 46.   19
                                                                           20

\* Delete as appropriate.                                                   21
For further description see ~~Appendix "A" (if applicable )~~ See Clause 46.  22

## 1. Duration
                                                                           23

The Owners agree to let and the Charterers agree to hire the Vessel from the time of delivery for a time charter   24
period
of minimum 12 months to about 14 months (about meaning 15 days more or less Charterers option) in   25
Charterers option via safe port(s), safe berth(s), safe anchorage(s), always afloat always within Institute
Warranty Limits

                                                                           26
                                                                           27
                                    within below mentioned trading limits.  28

## 2. Delivery
                                                                           29

The Vessel shall be placed at the disposal of the Charterers at on dropping last outward sea pilot one safe   30
port Singapore/Japan Range port in Owners option (intention Rizhao) any time, day or night, Sundays
and holidays included

                                                                           31

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A.), Inc. (ASBA). Any insertion or deletion to the form must be clearly visible. In the event of any modification made in the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

Printed by BIMCO's idea

~~The Vessel on her delivery~~  32

shall be ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted  33  34

for ordinary cargo service, having water ballast ~~and with sufficient power to operate all cargo-handling gear~~  35

~~simultaneously.~~  36

The Owners shall give the Charterers not less than          days notice of expected date of  37

delivery.  38

### 3.  On-Off Hire Survey  39

Prior to delivery and redelivery the parties shall, ~~unless otherwise agreed, each~~ jointly appoint one (1) surveyors,  40

~~for their~~

~~respective accounts,~~ who shall not later than at first loading port/last discharging port respectively, conduct  41

joint on-hire/off-hire surveys, for the purpose of ascertaining quantity of bunkers on board and the condition  42

of the Vessel. A ~~single report shall be prepared on each occasion and signed by each the surveyor, without~~  43

~~prejudice to his right to file a separate report setting forth items upon which the surveyors cannot agree.~~  44

~~If either party fails to have a representative attend the survey and sign the joint survey report, such party~~  45

~~shall nevertheless be bound for all purposes by the findings in any report prepared by the other party.~~  46

On-hire survey shall be on Charterers' time and off-hire survey on Owners' time. Both  parties hereto shall  47

equally share the cost and expense for the said inspections.

### 4. Dangerous Cargo/Cargo Exclusions (See Clause 59)  48

~~(a) The Vessel shall be employed in carrying lawful merchandise excluding any goods of a dangerous,~~  49

~~injurious, flammable or corrosive nature unless carried in accordance with the requirements or~~  50

~~recommendations of the competent authorities of the country of the Vessel's registry and of ports of~~  51

~~shipment and discharge and of any intermediate countries or ports through whose waters the Vessel must~~  52

~~pass. Without prejudice to the generality of the foregoing, in addition the following are specifically~~  53

~~excluded: livestock of any description, arms, ammunition, explosives, nuclear and radioactive materials.~~  54

55

56

57

58

59

60

61

62

63

64

~~(b) If IMO classified cargo is agreed to be carried, the amount of such cargo shall be limited to~~  65

~~————— tons and the Charterers shall provide the Master with any evidence he may~~  66

~~reasonably require to show that the cargo is packaged, labelled, loaded and stowed in accordance with IMO~~  67

~~regulations, failing which the Master is entitled to refuse such cargo or, if already loaded, to unload it at~~  68

~~the Charterers' risk and expense.~~  69

### 5. Trading Limits  70

The Vessel shall be employed in such lawful trades ~~between safe ports and safe places~~  71

within Institute Warranty Limits (I.W.L.) between safe port(s) or safe place(s) where she can safely enter,  72

lie always afloat at any time of tide and depart excluding

Cuba, Israel, Iraq, Cambodia, North Korea, Somalia, Ethiopia, Angola, Serbia, Montenegro, Albania, Liberia, Libya, Syria, Lebanon, Former Yugoslavia except Rijeka, Koper, Plomin and Bakar (allowed to trade), Russian ports situated along the Pacific Coast and area(s) and/or countries banned and boycotted by U.N., any areas or countries where war or warlike situation exits and any other countries prohibited from calling by the flag state

excluding  73

74

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A), Inc. (ASBA).  Any insertion or deletion to the form must be clearly visible.  In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply.  BIMCO and ASBA assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

Printed by BIMCO's idea

as the Charterers shall direct.

NAABSA in River Plate, Argentina, Uruguay and Paranagua, Rio Grande, Santos and Sao Francisco do Sul in Brazil only where it is customary for similar size vessel to safely lie aground. Other places than the ones mentioned to be always subject to the Owners' prior approval which not to be unreasonably withheld.

Should the political or social situation in the world change so as to accept as regular trade areas in the shipping industry any countries or places listed in the trading exclusions under this Chart Party, then such areas or places or countries may be excepted from the trading exclusions subject to Owners' prior consent, which shall not be unreasonably withheld.

On the other hand, if a country or countries or a port or ports other than listed in the trading exclusions under this Charter Party must be included into those trading exclusions due to the political or social situation of such countries during the currency of this Charter, the Owners have the right to include such area(s) or port(s) or country/countries into the trading exclusions under this Charter Party subject to the Charterers' prior consent, which shall not be unreasonably withheld

### 6. Owners to Provide                                                                                        77

The Owners shall provide and pay for the insurance of the Vessel, except as otherwise provided, and for          78
all provisions, cabin, deck, engine-room and other necessary stores, including boiler water, drinking water and    79
lubricating oil; shall pay for
wages, immigration and consular shipping and discharging fees of the crew and charges for port services          80
pertaining to the
crew; shall pay for all consular fees incurred due to the vessel's flag-state and for garbage disposal and        81
shall maintain the Vessel's class and keep her in a thoroughly efficient state in hull, machinery and
equipment for and during the service, and have a full complement of officers and crew.                           82

### 7 .Charterers to Provide                                                                                     83

The Charterers, while the Vessel is on hire, shall provide and pay for all the bunkers except as otherwise        84
agreed; shall pay for port charges (including compulsory watchmen and cargo watchmen and ~~compulsory~~          85
~~garbage disposal~~, canal tolls, all communication expenses pertaining to the Charterers' business ~~at cost~~,  86
customary and compulsory pilotages,
towages, agencies, commissions, consular charges (except those pertaining to individual crew members             87
or flag of the Vessel), and all other usual expenses except those stated in Clause 6, but when the Vessel        88
puts into a port for causes for which the Vessel is responsible (other than by stress of weather), then all       89
such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew           90
shall be for the Owners' account. Fumigations ordered because of cargoes carried or ports visited while          91
the Vessel is employed under this Charter Party shall be for the Charterers' account. ~~All other fumigations~~   92
~~shall be for the Charterers' account after the Vessel has been on charter for a continuous period of six~~      93
~~months or more.~~                                                                                              94

The Charterers shall provide and pay for necessary dunnage and also any extra fittings requisite for a            95
special trade or unusual cargo, but the Owners shall allow them the use of any dunnage already aboard            96
the Vessel. Prior to redelivery the Charterers shall remove their dunnage and fittings at their cost and in       97
their time.                                                                                                      98

### 8. Performance of Voyages                                                                                    99

(a) The Master shall perform the voyages with due despatch, and shall render all customary assistance           100
with the Vessel's crew. The Master shall be conversant with the English language and (although              101
appointed by the Owners) shall be under the orders and directions of the Charterers as regards             102
employment and agency; and the Charterers shall perform all cargo handling, including but not limited to    103
loading, stowing, trimming, lashing, securing, dunnaging, unlashing, discharging, and tallying, at their risk  104
and expense, under the supervision of the Master.                                                           105

(b) If the Charterers shall have reasonable cause to be dissatisfied with the conduct of the Master or        106

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A.), Inc. (ASBA). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA assume no responsibility for any loss, damage or expenses as a result of discrepancies between the original ASBA approved document and this computer generated document.

officers, the Owners shall, on receiving particulars of the complaint, investigate the same, and, if 107
necessary, make a change in the appointments. 108

9. **Bunkers – See Clause 86.** 109

(a) The Charterers on delivery, and the Owners on redelivery, shall take over and pay for all fuel and 110
diesel oil remaining on board the Vessel as hereunder. The Vessel shall be delivered with: 111
———— long*/metric* tons of fuel oil at the price of ———— per ton; 112
———— tons of diesel oil at the price of ———— per ton. The vessel shall 113
be redelivered with: ———— tons of fuel oil at the price of ———— per ton; 114
———— tons of diesel oil at the price of ———— per ton. 115

*Same tons apply throughout this clause.* 116

(b) The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines 117
and auxiliaries and which conform to the specification(s) as set out in Clause 46-13 Appendix A. 118

The Owners reserve their right to make a claim against the Charterers for any damage to the main engines 119
or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed 120
specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed 121
specification(s) or otherwise prove unsuitable for burning in the Vessel's engines or auxiliaries, the Owners 122
shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker 123
consumption, nor for any time lost and any other consequences. 124

125

10. **Rate of Hire/Redelivery Areas and Notices** 125

The Charterers shall pay for the use and hire of the said Vessel at the rate of $▓▓▓▓ 126
U.S. currency, daily including overtime, or $———— U.S. currency per ton on the Vessel's total deadweight 127
carrying capacity, including bunkers and stores, on ———— summer freeboard, per 30 days, 128
commencing on and from the time of the day of her delivery, as aforesaid, at and after the same rate for any 129
part
of a day month; hire shall continue until the hour of the day of her redelivery in like good order and condition as 130
and when the vessel was delivered,
ordinary wear and tear excepted, to the Owners (unless Vessel lost) at on dropping last outward sea pilot one 131
safe port Skaw/Cape Passero including UK/Eire or passing same westbound or Aden/Japan Range, if last
discharge port Arabian Gulf then redelivery passing Muscat outbound, if last port Red Sea then redelivery
Aden, any time day or night, Sundays and holidays included
132
133
unless otherwise mutually agreed. 134

The Charterers shall give the Owners not less than 30 days notice of vessels expected date and redelivery 135
range and 20/10 days notice of the Vessel's
expected date and probable port of redelivery and 5/3/1 days notice of definite port and date of redelivery. 136

For the purpose of hire calculations, the times of delivery, redelivery or termination of charter shall be 137
adjusted to GMT. 138

11. **Hire Payment** 139

(a) *Payment* 140

Payment of Hire shall be made in full in the currency of United States, without discount to Owners' bank 141
account designated so as to be received by the Owners or their designated payee in 142
, viz.
Korea Exchange Bank, Seosomun Branch, Seoul, Korea
Swift Code: KOEXKRSE
Account No.: 650 006402 451
Company Name: Dreamship Pte., Ltd.

This document is a computer generated HYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A.), Inc. (ASBA). Any insertion or deletion to this form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

in
currency, or in United States Currency, in funds available to the
Owners on the due date, 15 days in advance, and for the last 15 days month or part of same the approximate
amount of hire, and should same not cover the actual time, hire shall be paid for the balance day by day
as it becomes due, if so required by the Owners. Failing the punctual and regular payment of the hire,
or on any fundamental breach whatsoever of this Charter Party, the Owners shall be at liberty to
withdraw the Vessel from the service of the Charterers without prejudice to any claims they (the Owners)
may otherwise have on the Charterers.

~~At any time after the expiry of the grace period provided in Sub-clause 11 (b) hereunder and while the~~
~~hire is outstanding, the Owners shall, without prejudice to the liberty to withdraw, be entitled to withhold~~
~~the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever~~
~~for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners, and hire~~
~~shall continue to accrue and any extra expenses resulting from such withholding shall be for the~~
~~Charterers' account.~~

(b ) *Grace Period*

Where there is failure to make punctual and regular payment of hire due to oversight, negligence, errors
or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners
three (3) clear banking days (as recognized at the agreed place of payment) written notice to rectify the
failure, and when so rectified within those three (3) days following the Owners' notice, the payment shall
stand as regular and punctual.

Failure by the Charterers to pay the hire within three (3) days of their receiving the Owners' notice as
provided herein, shall entitle the Owners to withdraw as set forth in Sub-clause 11 (a) above.

(c) *Last Hire Payment*

Should the Vessel be on her voyage towards port of redelivery at the time the last and/or the penultimate
payment of hire is/are due, said payment(s) is/are to be made for such length of time as the Owners and
the Charterers may agree upon as being the estimated time necessary to complete the voyage, and taking
into account bunkers actually on board, to be taken over by the Owners and estimated disbursements for
the Owners' account before redelivery. Should same not cover the actual time, hire is to be paid for the
balance, day by day, as it becomes due. When the Vessel has been redelivered, any difference is to be
refunded by the Owners or paid by the Charterers, as the case may be.

(d) *Cash Advances*

Cash for the Vessel's ordinary disbursements at any port may be advanced by the Charterers, as required
by the Owners, subject to 2½ percent commission and such advances shall be deducted from the hire.
The Charterers, however, shall in no way be responsible for the application of such advances.

12. Berths

The Vessel shall be loaded and discharged in any safe dock or at any safe berth or safe place that
Charterers or their agents may direct, provided the Vessel can safely enter, lie and depart always afloat
at any time of tide except to the extent that NAABSA applies to the areas stipulated in Line 76 hereunder.

13. Spaces Available

(a) The whole reach of the Vessel's holds, decks, and other cargo spaces (not more than she can
reasonably and safely stow and carry), also accommodations for supercargo, if carried, shall be at the
Charterers' disposal, reserving only proper and sufficient space for the Vessel's officers, crew, tackle,
apparel, furniture, provisions, stores and fuel.

143
144
145
146
147
148
149
150
151
152
153
154
155
156
157
158
159
160
161
162
163
164
165
166
167
168
169
170
171
172
173
174
175
176
177
178
179
180
181
182
183
184
185
186
187

Printed by BIMCO's Idea

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A.), Inc. (ASBA). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

(b) In the event of deck cargo being carried, the Owners are to be and are hereby indemnified by the    188
Charterers for any loss and/or damage and/or liability of whatsoever nature caused to the Vessel as a    189
result of the carriage of deck cargo and which would not have arisen had deck cargo not been loaded.    190

## 14. Supercargo and Meals    191

The Charterers are entitled to appoint a supercargo, who shall accompany the Vessel at the Charterers'    192
risk and see that voyages are performed with due despatch. He is to be furnished with free    193
accommodation and same fare as provided for the Master's table, the Charterers paying at the rate of    194
USD 10.00 per day. The Owners shall victual pilots and customs officers and provide their accommodation, if    195
available, and also, when
authorized by the Charterers or their agents, shall victual tally clerks, stevedore's foreman, etc.,    196
Charterers paying at the rate of USD 5.00 per meal for all such victualling.    197
The Charterers to pay to the Owners at the lumpsum rate of USD 1,250 (One Thousand Two Hundred and
Fifty Dollars) per month in lieu of all radio-telegrams, telephone calls and other communication /
entertainment, if any, for the Charterers' business.

## 15. Sailing Orders and Logs    198

The Charterers shall furnish the Master from time to time with all requisite instructions and sailing    199
directions, in writing or by telegram, in the English language, and the Master shall keep full and correct deck and    200
engine
logs of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the    201
Charterers, their agents or supercargo, when required, with a true copy of such deck and engine logs,    202
showing the course of the Vessel, distance run and the consumption of bunkers. Any log extracts    203
required by the Charterers shall be in the English language.    204

## 16. Delivery/Cancelling    205

If required by the Charterers, time shall not commence before 22nd May, 2008 and should the    206
Vessel not be ready for delivery on or before 3rd June, 2008 but not later than ——— hours,    207
The The Charterers shall have the option of cancelling this Charter Party.    208

*Extension of Cancelling*    209

If the Owners warrant that, despite the exercise of due diligence by them, the Vessel will not be ready    210
for delivery by the cancelling date, and provided the Owners are able to state with reasonable certainty    211
the date on which the Vessel will be ready, they may, at the earliest seven days before the Vessel is    212
expected to sail for the port or place of delivery, require the Charterers to declare whether or not they will    213
cancel the Charter Party. Should the Charterers elect not to cancel, or should they fail to reply within two    214
days or by the cancelling date, whichever shall first occur, then the seventh day after the expected date    215
of readiness for delivery as notified by the Owners shall replace the original cancelling date. Should the    216
Vessel be further delayed, the Owners shall be entitled to require further declarations of the Charterers in    217
accordance with this Clause.    218

## 17. Off Hire    219

In the event of loss of time from deficiency and/or default and/or strike of officers or crew, or deficiency    220
of stores, fire, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the    221
arrest of the Vessel, (unless such arrest is caused by events for which the Charterers, their servants,    222
agents or subcontractors are responsible), or detention by average accidents to the Vessel or cargo unless    223
resulting from inherent vice, quality or defect of the cargo, drydocking for the purpose of examination or    224
painting bottom, or by any other similar cause preventing the full working of the Vessel, the payment of    225
hire and overtime, if any, shall cease for the time thereby lost. Should the Vessel deviate or put back    226
during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident    227
to the cargo or where permitted in lines 257 to 258 hereunder, the hire is to be suspended from the time    228
of her deviating or putting back until she is again in the same or equidistant position from the destination    229
and the voyage resumed therefrom. All bunkers used by the Vessel while off hire shall be for the Owners'    230
account. In the event of the Vessel being driven into port or to anchorage through stress of weather,    231

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A), Inc. (ASBA). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

Printed by BIMCO's Idea

trading to shallow harbors or to rivers or ports with bars, any detention of the Vessel and/or expenses     232
resulting from such detention shall be for the Charterers' account. If upon the voyage the speed be     233
reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, the time so lost, and     234
the cost of any extra bunkers consumed in consequence thereof, and all extra proven expenses may be     235
deducted from the hire.     236

18. Sublet     237

Unless otherwise agreed, the Charterers shall have the liberty to sublet the Vessel for all or any part of     238
the time covered by this Charter Party, but the Charterers remain responsible for the fulfillment of this     239
Charter Party.     240

19. Drydocking – See Clause 83.     241

The Vessel was last drydocked ———     242

*(a) The Owners shall have the option to place the Vessel in drydock during the currency of this Charter     243
at a convenient time and place, to be mutually agreed upon between the Owners and the Charterers, for     244
bottom cleaning and painting and/or repair as required by class or dictated by circumstances.     245

*(b) Except in case of emergency no drydocking shall take place during the currency of this Charter     246
Party.     247

* Delete as appropriate     248

20. Total Loss     249

Should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or     250
being last heard of) shall be returned to the Charterers at once.     251

21. Exceptions     252

The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the     253
seas, rivers, machinery, boilers, and navigation, and errors of navigation throughout this Charter, always     254
mutually excepted.     255

22. Liberties     256

The Vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels     257
in distress, and to deviate for the purpose of saving life and property. Time and costs and eventual earning for     258
such deviation to be equally shared between the Owners and the Charterers.

23. Liens     259

The Owners shall have a lien upon all cargoes and all sub-freights and/or sub-hire for any amounts due     260
under this Charter Party, including general average contributions, and the Charterers shall have a lien on     261
the Vessel for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be     262
returned at once.     263

The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien or encumbrance,     264
which might have priority over the title and interest of the Owners in the Vessel. The Charterers     265
undertake that during the period of this Charter Party, they will not procure any supplies or necessaries     266
or services, including any port expenses and bunkers, on the credit of the Owners or in the Owners' time.     267

24. Salvage     268

All derelicts and salvage shall be for the Owners' and the Charterers' equal benefit after deducting     269
Owners' and Charterers' expenses and crew's proportion.     270

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A.), Inc. (ASBA). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

25. General Average                                                                        271

General average shall be adjusted according to York-Antwerp Rules 1974, as amended 1994, ~~1990~~, or any    272
subsequent modification thereof, in London and settled in United States                   273
currency.                                                                                  274

The Charterers shall procure that all bills of lading issued during the currency of the Charter Party will    275
contain a provision to the effect that general average shall be adjusted according to York-Antwerp Rules    276
1974, as amended 1994, ~~1990~~, or any subsequent modification thereof and will include the "New Jason    277
Clause" as per Clause 31 .                                                                 278

Time charter hire shall not contribute to general average.                                 279

26. Navigation                                                                             280

Nothing herein stated is to be construed as a demise of the Vessel to the Time Charterers. The Owners    281
shall remain responsible for the navigation of the Vessel, acts of pilots and tug boats, insurance, crew,    282
and all other matters, same as when trading for their own account.                         283

27. Cargo Claims                                                                           284

Cargo claims as between the Owners and the Charterers shall be settled in accordance with the Inter-Club    285
New York Produce Exchange Agreement of February 1970, as amended 1996 ~~May, 1984~~, or any subsequent    286
modification or replacement thereof.                                                       287

28. Cargo Gear and Lights                                                                  288

~~The Owners shall maintain the cargo-handling gear of the Vessel which is as follows:~~    289
                                                                                           290
                                                                                           291
                                                                                           292
~~providing gear (for all derricks or cranes) capable of lifting capacity as described. The Owners shall also~~    293
~~provide on the Vessel for night work lights as on board, but all additional lights over those on board shall~~    294
~~be at the Charterers' expense. The Charterers shall have the use of any gear on board the Vessel. If~~    295
~~required by the Charterers, the Vessel shall work night and day and all cargo-handling gear shall be at the~~    296
~~Charterers' disposal during loading and discharging. In the event of disabled cargo-handling gear, or~~    297
~~insufficient power to operate the same, the Vessel is to be considered to be off hire to the extent that~~    298
~~time is actually lost to the Charterers and the Owners to pay stevedore stand-by charges occasioned~~    299
~~thereby, unless such disablement or insufficiency of power is caused by the Charterers' stevedores. If~~    300
~~required by the Charterers, the Owners shall bear the cost of hiring shore gear in lieu thereof, in which~~    301
~~case the Vessel shall remain on hire.~~                                                   302

29. Crew Overtime                                                                          303

~~In lieu of any overtime payments to officers and crew for work ordered by the Charterers or their agents,~~    304
~~the Charterers shall pay the Owners, concurrently with the hire ———— per month~~         305
~~or pro rata.~~                                                                           306

30. Bills of Lading                                                                        307

(a) The Master shall sign the bills of lading or waybills for cargo as presented in conformity with mates    308
or tally clerk's receipts. However, the Charterers may sign bills of lading or waybills on behalf of the    309
Master, with the Owner's prior written authority, always in conformity with mates or tally clerk's receipts.    310

(b) All bills of lading or waybills shall be without prejudice to this Charter Party and the Charterers shall    311
indemnify the Owners against all consequences or liabilities which may arise from any inconsistency    312
between this Charter Party and any bills of lading or waybills signed by the Charterers or by the Master    313
at their request.                                                                          314

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A.), Inc. (ASBA). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

(c) Bills of lading covering deck cargo shall be claused: "Shipped on deck at Charterers', Shippers' and    315
Receivers' risk, expense and responsibility, without liability on the part of the Vessel, or her Owners for    316
any loss, damage, expense or delay howsoever caused."    317

31. <u>Protective Clauses</u>    318

This Charter Party is subject to the following clauses all of which are also to be included in all bills of lading    319
or waybills issued hereunder:    320

(a) CLAUSE PARAMOUNT    321
"This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the    322
United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national    323
legislation as may mandatorily apply by virtue of origin or destination of the bills of lading, which shall    324
be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the    325
carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said    326
applicable Act. If any term of this bill of lading be repugnant to said applicable Act to any extent, such    327
term shall be void to that extent, but no further."    328

and    329

(b) BOTH-TO-BLAME COLLISION CLAUSE    330

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any    331
act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in    332
the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against    333
all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represents    334
loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other    335
or non-carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the    336
other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.    337

The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or    338
objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or    339
contact."    340

and    341

(c) NEW JASON CLAUSE    342

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage    343
resulting from any cause whatsoever, whether due to negligence or not, for which, or for the    344
consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods,    345
shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the    346
payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred,    347
and shall pay salvage and special charges incurred in respect of the goods.    348

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship    349
or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover    350
the estimated contribution of the goods and any salvage and special charges thereon shall, if required,    351
be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery."    352

and    353

(d) U.S. TRADE -DRUG CLAUSE    354

"In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986 or any re-enactment thereof, the    355
Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested    356
narcotic drugs and marijuana to be loaded or concealed on board the Vessel.    357

Non-compliance with the provisions of this clause shall amount to breach of warranty for consequences    358

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A.), Inc. (ASBA). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel    359
harmless and shall keep them indemnified against all claims whatsoever which may arise and be made    360
against them individually or jointly. Furthermore, all time lost and all expenses incurred, including fines,    361
as a result of the Charterers' breach of the provisions of this clause shall be for the Charterer's account    362
and the Vessel shall remain on hire.    363

Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this    364
clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable    365
time the Vessel is released and at their expense put up the bails to secure release of the Vessel.    366

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the    367
event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the    368
Vessel's personnel."    369

and    370

(e) WAR CLAUSES – "Bimco Standard War Risk Clause for Time Charters 1993" – Code Name:    371
"Conwartime 1993" hereto attached applies for this Clause

"(i) No contraband of war shall be shipped. The Vessel shall not be required, without the consent of the    372
Owners, which shall not be unreasonably withheld, to enter any port or zone which is involved in a state    373
of war, warlike operations, or hostilities, civil strife, insurrection or piracy whether there be a declaration    374
of war or not, where the Vessel, cargo or crew might reasonably be expected to be subject to capture,    375
seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de    376
facto authority or any purported governmental organization maintaining naval, military or air forces).    377

(ii) If such consent is given by the Owners, the Charterers will pay the provable additional cost of insuring    378
the Vessel against hull war risks in an amount equal to the value under her ordinary hull policy but not    379
exceeding a valuation of _____. In addition, the Owners may purchase and the    380
Charterers will pay for war risk insurance on ancillary risks such as loss of hire, freight disbursements,    381
total loss, blocking and trapping, etc. If such insurance is not obtainable commercially or through a    382
government program, the Vessel shall not be required to enter or remain at any such port or zone.    383

(iii) In the event of the existence of the conditions described in (i) subsequent to the date of this Charter,    384
or while the Vessel is on hire under this Charter, the Charterers shall, in respect of voyages to any such    385
port or zone assume the provable additional cost of wages and insurance properly incurred in connection    386
with master, officers and crew as a consequence of such war, warlike operations or hostilities.    387

(iv) Any war bonus to officers and crew due to the Vessel's trading or cargo carried shall be for the    388
Charterers' account."    389

## 32. War Cancellation    390

In the event of the outbreak of war (whether there be a declaration of war or not) between any two or    391
more of the following countries: United Kingdom, U.S.A., Commonwealth of Independent States (CIS) former    392
called U.S.S.R., People's Republic of China, Italy and Japan    393
    394
    395
either the Owners or the Charterers may cancel this Charter Party. Whereupon, the Charterers shall    396
redeliver the Vessel to the Owners in accordance with Clause 10; if she has cargo on board, after    397
discharge thereof at destination, or, if debarred under this Clause from reaching or entering it, at a near    398
open and safe port as directed by the Owners; or, if she has no cargo on board, at the port at which she    399
then is; or, if at sea, at a near open and safe port as directed by the Owners. In all cases hire shall    400
continue to be paid in accordance with Clause 11 and except as aforesaid all other provisions of this    401
Charter Party shall apply until redelivery.    402

## 33. Ice    403

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A.), Inc. (ASBA). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

Printed by BIMCO's idea

The Vessel shall not be required to enter or remain in any icebound port or area, ~~nor any port or area~~ 404
~~where lights or lightships have been or are about to be withdrawn by reason of ice,~~ nor where on account of ice 405
there is
risk that in the ordinary course of things the Vessel will not be able on account of ice to safely enter and 406
remain in the port or area or to depart ~~get out~~ after completion of ~~having completed~~ loading or discharging. 407
~~Subject to the~~
~~Owners' prior approval the~~ The Vessel shall not be obliged to force ice ~~is to~~ nor to follow ice-breakers when 408
~~reasonably required with regard to her~~
~~size, construction and ice class.~~ 409

## 34. Requisition 410

Should the Vessel be requisitioned by the government of the Vessel's flag during the period of this Charter 411
Party, the Vessel shall be deemed to be off hire during the period of such requisition, and any hire paid 412
by the said government in respect of such requisition period shall be retained by the Owners. The period 413
during which the Vessel is on requisition to the said government shall count as part of the period provided 414
for in this Charter Party. 415
If the period of requisition exceeds **three (3)** months, either party shall have the option 416
of cancelling this Charter Party and no consequential claim may be made by either party. 417

## 35. Stevedore Damage – See Clause 87. 418

~~Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all~~ 419
~~damage to the Vessel caused by stevedores provided the Master has notified the Charterers and/or their~~ 420
~~agents in writing as soon as practical but not later than 48 hours after any damage is discovered. Such~~ 421
~~notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent~~ 422
~~of such damage.~~ 423

~~(a) In case of any and all damage(s) affecting the Vessel's seaworthiness and/or the safety of the crew~~ 424
~~and/or affecting the trading capabilities of the Vessel, the Charterers shall immediately arrange for repairs~~ 425
~~of such damage(s) at their expense and the Vessel is to remain on hire until such repairs are completed~~ 426
~~and if required passed by the Vessel's classification society.~~ 427

~~(b) Any and all damage(s) not described under point (a) above shall be repaired at the Charterers' option,~~ 428
~~before or after redelivery concurrently with the Owners' work. In such case no hire and/or expenses will~~ 429
~~be paid to the Owners except and insofar as the time and/or the expenses required for the repairs for~~ 430
~~which the Charterers are responsible, exceed the time and/or expenses necessary to carry out the~~ 431
~~Owners' work.~~ 432

## 36. Cleaning of Holds See Clause 88. 433

~~The Charterers shall provide and pay extra for sweeping and/or washing and/or cleaning of holds between~~ 434
~~Voyages and/or between cargoes provided such work can be undertaken by the crew and is permitted by~~ 435
~~local regulations, at the rate of ———— per hold.~~ 436

~~In connection with any such operation, the Owners shall not be responsible if the Vessel's holds are not~~ 437
~~accepted or passed by the port or any other authority. The Charterers shall have the option to re-deliver~~ 438
~~the Vessel with unclean/unswept holds against a lumpsum payment of ———— in lieu of cleaning.~~ 439

## 37. Taxes 440

Charterers to pay all local, State, National taxes and/or dues assessed on the Vessel or the Owners 441
resulting from the Charterers' orders herein, whether assessed during or after the currency of this Charter 442
Party including any taxes and/or dues on cargo and/or freights and/or sub-freights ~~and/or hire (excluding~~ 443
~~taxes levied by the country of the flag of the Vessel or the Owners).~~ 444

## 38. Charterers' Colors 445

The Charterers shall have the privilege of flying their own house flag and painting the Vessel's hull and funnel 446

This document is a computer generated HYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A.), Inc. (ASBA). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

with their
own colours markings. The Vessel shall be repainted in the Owners' colors before termination of the Charter 447
Party. Cost and time of painting, maintaining and repainting those changes effected by the Charterers 448
shall be for the Charterers' account. 449

## 39. Laid Up Returns
450

The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their 451
underwriters as and when received from underwriters by reason of the Vessel being in port for a minimum 452
period of 30 days if on full hire for this period or pro rata for the time actually on hire. 453

## 40. Documentation
454

The Owners shall provide any documentation relating to the Vessel that may be required to permit the 455
Vessel to trade within the agreed trade limits, including, but not limited to certificates of financial 456
responsibility for oil pollution, provided such oil pollution certificates are obtainable from the Owners' 457
P & I club, valid international tonnage certificate, Suez and Panama tonnage certificates, valid certificate 458
of registry. and certificates relating to the strength and/or serviceability of the Vessel's gear. 459

## 41. Stowaways
460

(a)  (i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining 461
Access to the Vessel by means of secreting away in the goods and/or containers shipped by the 462
Charterers. 463

(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained 464
Access to the Vessel by means of secreting away in the goods and/or containers shipped by the 465
Charterers, this shall amount to breach of charter for the consequences of which the Charterers 466
shall be liable and shall hold the Owners harmless and shall keep them indemnified against all 467
claims whatsoever which may arise and be made against them. Furthermore, all time lost and all 468
expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account 469
and the Vessel shall remain on hire. 470

(iii) Should the Vessel be arrested as a result of the Charterers' breach of charter according to 471
sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a 472
reasonable time, the Vessel is released and at their expense put up bail to secure release of the 473
Vessel. 474

(b) (i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained 475
access to the Vessel by means other than secreting away in the goods and/or containers shipped 476
by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including 477
fines, shall be for the Owners' account and the Vessel shall be off hire. 478

(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel 479
by means other than secreting away in the goods and/or containers shipped by the Charterers, 480
the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel 481
is released and at their expense put up bail to secure release of the Vessel. 482

## 42. Smuggling
483

In the event of smuggling by the Master, Officers and/or crew, the Owners shall bear the cost of any 484
fines, taxes, or imposts levied and the Vessel shall be off hire for any time lost as a result thereof. 485

## 43. Commissions
486

A commission of 1.00 percent is payable by the Vessel and the Owners to Bidsted & Co. A/S, Copenhagen and 487
1.00 per cent to Ace Chartering Corp., Seoul

488
489

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A.), Inc. (ASBA). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

Printed by BIMCO's idea

on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter. 490 491

## 44. Address Commission 492

An address commission of 3.75 percent is payable to Charterers 493 494 495

on hire earned and paid under this Charter. 496

## 45. Arbitration 497

(a) NEW YORK 498
All disputes arising out of this contract shall be arbitrated at New York in the following manner, and 499
subject to U.S. Law: 500

One Arbitrator is to be appointed by each of the parties hereto and a third by the two so chosen. Their 501
decision or that of any two of them shall be final, and for the purpose of enforcing any award, this 502
agreement may be made a rule of the court. The Arbitrators shall be commercial men, conversant with 503
shipping matters. Such Arbitration is to be conducted in accordance with the rules of the Society of 504
Maritime Arbitrators Inc. 505

For disputes where the total amount claimed by either party does not exceed US $ ___ ** 506
the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society 507
of Maritime Arbitrators Inc. 508

(b) LONDON 509
All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree 510
forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business 511
in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in Shipping, 512
One to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. No 513
award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as 514
above, unless objection to his action be taken before the award is made. Any dispute arising hereunder 515
shall be governed by English Law. 516

For disputes where the total amount claimed by either party does not exceed US $ 50,000 ** 517
the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime 518
Arbitrators Association. 519

*Delete para (a) or (b) as appropriate 520

** Where no figure is supplied in the blank space this provision only shall be void but the other provisions 521
of this clause shall have full force and remain in effect. 522

If mutually agreed, clauses 46 to 92, both inclusive, as attached hereto are fully 523
incorporated in this Charter Party. 524

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A.) Inc. (ASBA). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

525
526
**APPENDIX "A"**

To Charter Party dated                      527
Between        Owners                       528
And        Charterers                       529

Further details of the Vessel:              530

Printed by BIMCO's idea

This document is a computer generated NYPE 93 form printed by authority of the Association of Ship Brokers and Agents (U.S.A.), Inc. (ASBA). Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original ASBA document shall apply. BIMCO and ASBA assume no responsibility for any loss, damage or expense as a result of discrepancies between the original ASBA approved document and this computer generated document.

ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
M/V "MEGALOHARI " - DATED LONDON,  2nd May, 2008

BIDSTED & CO. %

Clause 46    Description:
M/V " PATRIZIA D'AMATO "
Flag: Cyprus
Year/month/where built (yard): 2004 / June / Imabari Shipbuilding Co. Ltd.
Vessel is self-trimming singledeck bulkcarrier with engine/bridge aft ;
Vessels communication details
    - inm-b tlx nos. 320948514
    - inm-b fax nos. 320948512
    - inm-c tlx nos. 420948510
    - fleet33 fax nos. 764842264
H8GA / +335125811 / 335125813 / 335125810 / 335125811 / 335125814
Vessel's classification society/full class notation/IMO number:
BV / Nippon Kaiji Kyokai / 9296066

MAIN PARTICULARS ( all about) :
Loa/beam/depth moulded/LBP: 224,94/32,26/19,5/217
Summer deadweight/draft/TPI/TPC: 76633/14,14/169,16/66,6
Winter deadweight/draft: 74682/13,85
Tropical deadweight/draft: 78593/14,43
International gross/net: 39727/25354
Suez net/Panama net: 38372,95/32841
Constants excluding fresh water: 223 based on "loading manual"
Freshwater capacity: 347
DWAT Panama (dead weight all told):60,960(S.G 1.00) with draft12.04 m

CARGO SPACE/HATCHES :
Number of holds/hatches: 7/7
Grain/bale capacity each hold (including hatch) in CBF:
    No 1:407488
    No 2:472673
    No 3:469582
    No 4:470635
    No 5:473387
    No 6:472928
    No 7:437804
    Total 3204495/
Corrugations vertical or horizontal: Vertical
Natural or mechanical ventilation in holds: Natural
Holds are CO2 fitted: No
Strengthened for carriage of heavy cargoes in alternate holds: Yes
If yes, which holds may be left empty: 2, 4, 6
Type of hatchcovers: Side rolling type

Confirm hatches are fitted with permanent cement holes: Yes
If yes, please advise number, dimensions and location each hatch: Dia 700mm, total 14 places on
each panel of hatch covers
Is the vessel log fitted: N/A

ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
M/V "MEGALOHARI" - DATED LONDON, 2nd May, 2008

BIDSTED & CO. %

Confirm whether vessel fitted W.W.F (Australian hold ladders): Yes

A)  Length/Beam of each tanktop:
      No 1. 24/F 9,5/A 23,5
      No 2. 23,1/23,5
      No 3. 23,1/23,5
      No 4. 23,1/23,5
      No 5. 23,1/23,5
      No 6. 23,1/23,5
      No 7. 23,1/F 23,5/A 9,1

B) Length/beam of each hatch:
      No 1. 17,1/12,8
      No 2. 17,1/15,6
      No 3. 17,1/15,6
      No 4. 17,1/15,6
      No 5. 17,1/15,6
      No 6. 17,1/15,6
      No 7. 17,1/15,6

C) Distance keel to highest point on vessel: 48,61

D) Distance fwd hatchcoaming 1st hatch-aft hatchcoaming last hatch: 171,25

E) Waterline to top of hatchcoaming in heavy ballast condition:
      1: 15,55
      2: 13,88
      3: 13,59
      4: 13,3
      5: 13,01
      6: 12,72
      7: 12,43
(Included flooded hold and draft F:10/A:9,54)

Speed / Consumptions:
14.3 knots Laden on 35.0 metric tons Intermediate Fuel Oil / 14.8 metric tons Ballast on 32.0 metric
tons Intermediate Fuel Oil.
Both cases plus 2.0 metric tons Intermediate Fuel Oil.
Bunker grade for IFO 380cst

Port Consumption: 2.5 metric tons Intermediate Fuel Oil.

H+M Insurance value is 100 million

Name of pandi club: standard steamship

Confirm vessel fully ism/itf/ahl/wwf fitted: Yes

ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
M/V "MEGALOHARI " - DATED LONDON, 2nd May, 2008

BIDSTED & CO. %

Last 3 cargoes including ports of load/discharge
  - iron ore concentrate in bulk (koolan is / rizhao)
  - wheat
  - coal in bulk

Confirm vessel have gangway aft: yes
All details 'about'

Clause 47
Deleted.

Clause 48
Deleted.

Clause 49     Flag / Crew
Vessel will be registered in Panama. However, Owners have the option to change the vessel's flag
during the currency of this Charter, if it should become necessary for some reason or other. In
addition Owners have the right to change vessel's crew at Owners' discretion.

In case of change of flag, unless such change is required by the Charterers, any eventual or
additional cost and/or expenses charged for vessel's new flag / ownership / managers to be for
Owners' account.

Clause 50     I.S.M. Code
During the currency of this Charter Party, Owners shall procure that the vessel and "The
Company" (as defined by ISM Code) shall comply with the requirement of the ISM Code.

Upon request the Owners shall provide a copy of the relevant documents of compliance (DOC)
and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss damages, expense or delay caused by
failure on the part of the Owners or "The Company" to comply with the ISM Code shall be for
Owners' account.

Clause 51     Dual DWT Certificate Clause
Owners confirm the vessel has dual tonnage certificate to discharge grain in Japan.

The expenses for two kinds of "Loadline Certificates" which are provided the vessel by the class
before the delivery of the vessel to the Owners to be for the Owners' account, whereas the
expenses for acquisition of "Statutory Survey Record" for re-admeasurement after the vessel is
delivered to the Charterers under this Charter Party to be for the Charterers' account.'

Clause 52     Breaking I.W.L.
Charterers have the right to break the Limits of Institute Warranties upon giving due notice to the
Owners, provided the Owners' prior approval is obtained. Charterers shall reimburse extra
insurance incurred thereby and are entitled to have the benefit of any discounts received by
Owners for such extra insurance.

ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
M/V "MEGALOHARI " - DATED LONDON, 2nd May, 2008

BIDSTED & CO. ⅛

<u>Clause 53      Boycott</u>
Should the vessel be boycotted, picketed, black-listed or similar incident be caused at any port or
place by shore and/or port labours, tug boats, and/or pilot, or by government and/or any
authority, by reason of the vessel's flag / registry / manning or ownership or the terms and
conditions on which members of the vessel's officers / crew are employed, or by reason of the
trading of this vessel, except the case where such trading is ordered by the Charterers, or any
other vessel under the same ownership, management, operation or control, or by reason of the
vessel's construction and/or her fitting and/or equipment, all consequences and any extra
expenses incurred therefrom to be for the Owners' account and the Charterers are entitled to place
the vessel off-hire for any time lost by such reasons.

<u>Clause 54      Deratting Certificate</u>
The Vessel shall be delivered with valid deratting or deratting exemption certificate. If such
certificate does not cover the whole period of this Charter, costs of renewal of certificate shall be
for the Owners' account. Any detention and extra expenses incurred thereby shall also be for the
Owners' account. However, if these certificates are required due to the Charterers' goods carried
under this Charter-Party, such expenses including detention shall be for the account of the
Charterers.

<u>Clause 55      Quarantine</u>
Normal quarantine time and expenses for the Vessel's entering port and for any detention
ascribed to Charterers shall be for the Charterers' account, but any time of detention and expenses
for quarantine due to pestilence, illness and etc., of the Master, Officers and crew shall be for the
Owners' account.

<u>Clause 56      Vaccination Certificates</u>
The Owners shall arrange at their expense for the Master, Officers and crew of the Vessel to hold
valid vaccination certificates during the currency of this Charter.

<u>Clause 57      Equipment in compliance with U.S. Safety and Health Regulations</u>
The Vessel's equipment shall comply with U.S. Public Law 85 – 742 Part 9 (Safety and health
Regulation for Longshoremen) when she loads or discharges her cargo in U.S. ports.

If stevedores, longshoremen or other labours are not permitted to work by reason of any failure of
the Master, the Owners and/or their agents to comply with the aforementioned regulations, the
Owners shall make immediate corrective measures and the hire is to be suspended for the time
thereby lost and any extra expenses directly thereby incurred, including stevedore's stand-by time
shall be for the Owners' account.

In the event that any amendment to or revision of the aforementioned regulations require any
significant change or improvement of the Vessel's structure or any expensive new equipment as
well as any additional insurance premium and/or acquisition of any extra certificates, the
Charterers and the Owners shall discuss in good faith and solve the situation by mutual
agreement.

- 4 -

ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
M/V "MEGALOHARI" - DATED LONDON, 2nd May, 2008

BIDSTED & CO. %

Clause 58    P. & I. Club
The Owners guarantee that the vessel will on delivery enter and throughout the currency of this Charter Party retain full cover from one of the Protection and Indemnity (P. & I.) Clubs in respect of their liability for personal accidents or injuries to third parties. Such insurance shall include cover against cargo claims.

The Charterers shall be entitled to the benefit of such entry to the extent that the Rules allow.

Clause 59    Dangerous Cargo / Cargo Exclusions
Vessel shall be employed in carrying lawful cargoes excluding any goods of a dangerous, injurious, flammable or corrosive nature classified under the IMO regulations. Without prejudice to the generality of the foregoing, in addition the followings are specifically excluded from the carriage by the vessel:

Livestock, arms, ammunition, explosives (black powder, blasting caps, detonators, loaded bombs, dynamite and TNT), nuclear and radioactive material and its waste, petroleum and its by-products, tar and turning and motor blocks, pitch in bulk, sodium sulphate, calcium hydrochloride, bone meal, charcoal, turpentine, ferro-silicon, seed cake, oil cake, copra, pond coal, pebbles, sponge iron, asphalt, sunflower seed expellers, ammonium nitrate, naphtha and its products, direct reduced iron, hot briquetted iron, asbestos, hides, scrap, creosoted goods, calcium carbide, acids, logs, brown coal, fishmeal.

Cement / Cement Clinker:
To be restricted to maximum two (2) cargoes per year, but shall not be consecutive voyages and shall not be last cargo before redelivery.

If cement / cement clinker is loaded, the Charterers to clean the Vessel's holds thoroughly at the Charterers' time and expense up to Master's satisfaction.

If they may request the Vessel's crew to undertake hold-cleaning after discharge of the cargo, the Charterers must pay a lumpsum of U.S. $300.00 (Three Hundred Dollars) per hold as a bonus in addition to extra crew work fee for cleaning of holds between voyages, which will be discussed at the time of negotiation of details of the Charter Party, provided, however, that the Owners and the Vessel shall not warrant that the holds cleaned by crew will be sufficiently cleaned / accepted at next loading port. The Charterers shall provide the Vessel with one set each of a Water-Tobey and submerged pump to facilitate such extra works by the Vessel's crew. The Owners to seal all hatches where such cargo loaded by marine tape or similar tape if required by the Charterers but cost of such tape to be reimbursed by the Charterers upon completion of loading. Master / crew are instructed to clean hatch sealing and grooves before loading.

Petcoke:
Maximum two (2) cargoes of Petroleum Coke per year, but shall not be consecutive voyages and shall not be last cargo before redelivery.

If petroleum coke is loaded, the Charterers to clean the Vessel's holds thoroughly at the Charterers' time and expense up to Master's satisfaction. If they may request the Vessel's crew to undertake hold cleaning, the Charterers must pay a lumpsum U.S. $300.00 (Three Hundred

- 5 -

ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
M/V "MEGALOHARI" - DATED LONDON, 2nd May, 2008

BIDSTED & CO. %

Dollars) per hold as a bonus in addition to in addition to extra crew work fee for cleaning of holds
between voyages, which will be as per negotiations, provided, however, that the Owners and the
Vessel shall not warrant that the holds cleaned by crew will be sufficiently cleaned / accepted at
next loading port.

Sulphur / Salt:

Maximum two (2) cargoes of either Sulphur or Salt per year (either one (1) cargo of Sulphur and
one (1) cargo of Salt or two (2) cargoes of each), but shall not be consecutive voyages and shall not
be last cargo before redelivery. The cargo shall be loaded, stowed, carried and discharged strictly
in accordance with applicable national / international regulations and/or IMO Code and
recommendations at the Charterers' risk and expenses.

If lime coating/washing of holds is required by the Shippers and/or Owners, the Charterers to
arrange the same at the Charterers' risk and expenses and in their time. If the Owners require
paint coating of holds instead of lime coating, the Charterers to arrange the same at the
Charterers' risk and expenses and in their time, provided, however, that paint-coating is not more
expensive than usual lime coating / washing and subject to the Shippers' approval which not to be
unreasonably withheld.

The Charterers shall provide the vessel with a necessary quantity of paint or lime and execute
necessary work at their cost and in their time prior to loading up to Master's full satisfaction and
remove paint-coating or lime coating after discharge up to Master's full satisfaction.
The Charterers to clean the Vessel's holds thoroughly at the Charterers' time and expense. If they
may request the Vessel's crew to undertake hold cleaning, the Charterers must pay a lumpsum
U.S. $300.00 (Three Hundred Dollars) per hold as a bonus in addition to extra crew work fee for
cleaning of holds between voyages, which will be discussed at the time of negotiation of details of
the Charter Party, provided, however, that the Owners and the Vessel shall not warrant that the
holds cleaned by crew will be sufficiently cleaned / accepted at next loading port.

Notwithstanding foregoing, the Charterers are allowed to load maximum six (6) cargoes per year
in total for the carriage of Cement / Cement Clinker / Petcoke / Sulphur / Salt.

Clause 60     Grain Loading

The vessel is suitable for carrying cargoes of heavy grain in bulk in all holds without requiring
any securing arrangements. For the carriage of grain in bulk, the vessel to have on board
throughout the currency of this timecharter the Grain Loading Booklet and other necessary
documents required in accordance with the "International Grain Code", as amended, adopted by
IMO resolution MSC. 23 (59) dated May 23, 1991, and approved by the Classification Society of the
Vessel to whom the flag-state delegates the right. The said Booklet shall include the table of
heeling moments for "filled holds / untrimmed ends" approved in accordance with the said Code.

Clause 61     Alternate Holds Loading

The vessel is allowed to sail with alternate holds empty, also with one/two holds, out of Nos. 2, 4
and 6, slack and/or empty subject to trim and strength according to the Grain Loading Booklet as
stipulated Clause 60. Any additional trimming over normal spout or chute trimming to be for
Owners' account.

ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
M/V "MEGALOHARI " - DATED LONDON, 2nd May, 2008

BIDSTED & CO. ¼

Clause 62    Water Ballast
Subject to the Master's consent, the Charterers have the right to instruct him to utilise the vessel's maximum water ballast capacity including the floodable hold in order to bring down the vessel's height so as to get her into position under loading and/or discharging appliances, however always in compliance with stability and freeboard and safety regulations.

Clause 63    Ocean Route
The vessel shall be capable at all times during the currency of this Charter of steaming as per description.

For the purpose of this Charter 'Good weather conditions' are to be defined as weather conditions with wind not exceeding Beaufort Force 4 and Sea Douglas 3.

Charterers may in their option and at their cost engage Ocean Route to Monitor vessel's course, position, speed, etc. in order to maximize vessel's performance, Master is to follow Ocean Route's suggestion concerning navigation but Master, at his reasonable direction, may not follow suggested route in which case he has to detail in log book the reasons for departing from them.

Any deviation to be advised as soon as possible both to Ocean Route and to Charterers' stating reason. In the event of any discrepancy or dispute between deck log and Ocean Route, the independent calculations carried out by Ocean Route to be accepted as binding by both parties.

Clause 64    Double Banking
The Charterers have the right to load / discharge cargo from / to vessel lighters / barges etc., at a safe dock or wharf or anchorage where it is customary and safe for the vessels of similar size and type. The Charterers to supply fenders at their expense and in their time to the master's satisfaction, which not to be unreasonably withheld. If at any time during the operation, the Master considers it unsafe to continue due to adverse weather conditions etc. the Master may order the other vessels, lighters and/or barges away from his vessel or remove his own vessel in order to avoid prejudicing the safety of the vessel(s). The Master to always act within reason and render Charterers his full co-operation for such operations, particularly when same is custom of the port. Any additional insurance premiums incurred by the Owners for such operations shall be reimbursed by the Charterers. The Charterers also to reimburse the Owners for the loss of hire in consequence of eventual damages incurred by the vessel because of such operations.

Clause 65    Cargo Hold Painting
The Owners may paint cargo holds as usual maintenance practice without the Charterers' permission in order to keep vessel's holds clean/rust free. In case such painting is performed for the purpose other than usual maintenance practice on the Owners' side, such paint work during the currency of this Charter to be done only after consultation with the Charterers and having their express permission. In case the same is required by the Charterers, time and expenses (excepting such painting during drydocking) to be for Charterers' account.

Clause 66    Off-Hire due to Water Pollution
The vessel shall be off hire during any time lost on account of the vessel's non-compliance with government and/or safe regulations pertaining to water pollution.

ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
M/V "MEGALOHARI " - DATED LONDON, 2nd May, 2008

BIDSTED & CO. %

### Clause 67    Non-Production of Bill(s) of Lading

The Owners and the Master agree to release entire cargo against a Letter of Indemnity (LOI) issued and signed by the Charterers in accordance with the form and wording of the Owners' P. & I. Club's, only when the Original Bill of Lading has not arrived at discharging port in time. The Charterers shall indemnify Owners for all consequences arising from Charterers' request for the release of cargo without presentation of the original Bill(s) of Lading. The Charterers shall send the said LOI by fax to the Owners' Office before commencement of discharging cargo. It is understood that such Letter of Indemnity shall automatically become null and void against presentation of a duly endorsed original Bill of Lading, which to be sent to the Owners by mail immediately when available.

### Clause 68    The Vessel's Class / Insurance

The Owners undertake to maintain the vessel's class during the currency of this Charter. The Owners guarantee that the vessel will be insured for collision liability with full protection. Hull and Machinery Insurance shall include "Bering Sea Clause".

### Clause 69    Tele-Communication Equipment

The vessel shall be equipped with INMARSAT C& B in addition to telegraph and VHF telephone in compliance with international regulations to allow the vessel to communicate with land stations.

### Clause 70    P.& I. Bunkering Clause

Within the trading limits stipulated in Clause 3, the Charterers shall, in addition to all other liberties, shall have the liberty as part of the proposed voyage(s) under this timecharter of ordering the vessel to proceed to any port or ports at which bunker oil is available for the purpose of bunkering at any stage of the said voyage(s) whatsoever and whether such ports are on or off the direct and/or customary route or routes between any of the ports of loading and/or discharging for which the vessel is scheduled, and may there take oil bunkers in any quantity, but up to 85% of each of the fuel tanks and deep-tanks of the vessel, in the discretion of time Charterers, whether such amount is or is not required for the voyage(s) in question. In the event of Charterers taking such oil in a compartment which can normally be used for the carriage of fuel oil but which is clean at the time the oil is shipped, the Charterers undertake to clean same to the Master's satisfaction at their own expense and in their time prior to redelivery.

### Clause 71    I.T.F.

It is hereby mutually agreed between Owners/Charterers that Owners of the vessel guarantee that the minimum terms and conditions of employment of the crew are now, or will be prior to representation of the vessel for delivery, and will remain for the period of this charter party, covered by an I.T.F. Agreement or a Bona Fide Trade Union Agreement acceptable to the I.T.F.

### Clause 72    Owners' Agent

Charterers agree that their Officers and/or Agents will deliver crew mail free of charge and assist the Master over minor ship's husbandry matters, debiting Owners with the actual costs involved. For major ship's husbandry matters such as dry-docking, changes of major part of crew etc. Owners will appoint their own Agents.

ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
M/V "MEGALOHARI " - DATED LONDON, 2nd May, 2008

BIDSTED & CO. %

### Clause 73    Oil Pollution

(1)    Owners warrant that throughout the currency of this charter they will provide the vessel
with the following certificates:
Certificates issued pursuant to Section 1016 (a) of the Oil Pollution Act 1990, and Section 108
(a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as
amended in accordance with Part 138 of Coast Guard Regulations 33 CFR, so long as these
can be obtained by the Owners from or by (identify the applicable scheme or schemes).

(2)    Notwithstanding anything whether printed or typed herein to the contrary.
(a) Save as required for compliance with paragraph (1) hereof, Owners shall not be required
to establish or maintain financial security or responsibility in respect of oil or other pollution
damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial
or contiguous waters of any country, state or territory in performance of this Charter.

(b) Charterers shall indemnify Owners and hold them harmless in respect of any loss,
damage, liability or expense (including but not limited to the costs of any delay incurred by
the vessel as a result of any failure by the Charterers promptly to give alternative voyage
orders) whatsoever and howsoever arising which Owners may sustain by reason of any
requirement to establish or maintain financial security or responsibility in order to enter,
remain in or leave any port, place or waters, other than to the extent provided in paragraph
(1) hereof.

(c) Owners shall not be liable for any loss, damage, liability or expense whatsoever and
howsoever arising which Charterers and/or the holders of any bill of lading issued pursuant
to this Charter may sustain by reason of any requirement to establish or maintain financial
security or responsibility in order to enter, remain in or leave any port, place or waters,
other than to the extent provided in paragraph (1) hereof.

(3)    Charterers warrant that the terms of this Clause will be incorporated effectively into any Bill
of Lading issued pursuant to this Charter.

### Clause 74    Detention

Should the vessel be seized or detained by any Government or legitimate authority or in
consequence of any legal action against Owners and/or the vessel during the currency of this
Charter, Charterers' liability shall cease from the time of such seizure or detention. All time los t
shall be treated as off-hire until the time of her release and return to the same or equivalent
position and any extra expenses, including the cost of bunkers consumed during such period, to
be for Owners' account unless such seizure or detention is occasioned by any personal act or
omission or default of Charterers or their agents, or by reason of cargo carried. Charterers to have
the option to cancel balance of charter period after the vessel has been off-hire under this clause
for not less than 30 (thirty) consecutive days.

### Clause 75    Hatch Operation

All opening and closing of hatches to be done by vessel's crew, if requested by Charterers,
provided it is allowed by shore regulations and weather conditions.

ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
M/V "MEGALOHARI " - DATED LONDON, 2nd May, 2008
BIDSTED & CO. %

Clause 76    Mobile Cranes
Owners guarantee that configuration of vessel will permit placement of suitable mobile cranes on
deck at each hatch, the weight of such cranes including weight of cargo will not exceed deck
strength.

The Charterers shall have the right to place any additional equipment and/or fittings on board to
load, discharge and/or secure the cargo subject to the Owners' prior approval. Such work shall be
done at the Charterers' expenses and time, and the Charterers shall remove such equipment and
fitting at their expenses and time prior to redelivery if so required by the Owners.

The Charterers have the option to discharge the vessel by means of mechanical crane called
"Cavalletto system" temporarily placed on board the vessel, however, such placement and
operation on board the vessel shall be always subject to and within the vessel's strength given by
the Owners and pursuant to Class regulations, if applicable. The Charterers shall be fully
responsible for and indemnify the Owners for any and all damages, time lost and/or class
surveyor's inspection arising from such operation and placement on board the vessel.

If mobile cranes are used for discharging Coal in Taiwan, cutting and welding of the hatchcovers
to be allowed, also vacuvators to be allowed but always subject to Head Owner's approval.

Clause 77    Hamburg Rules Clause
Neither the Charterers nor their Agents shall permit the issue of any Bill of Lading, Way Bill or
other document evidencing a contract of carriage (whether or not signed on behalf of the Owners
or on the Charterers' behalf or on behalf of any Sub-Charterer) incorporating where not
compulsorily applicable, the Hamburg Rules or any legislation imposing liabilities in excess of the
Hague or Hague-Visby Rules.

The Charterers shall indemnify the Owners against any liability, loss or damage that may result
from any breach of the foregoing provisions of this Clause.

Clause 78    Superficial Inspection
Charterers have the option of holding at any time of this Charter-Party a superficial inspection at
their time / expense / risk without interference with vessel's normal operation.

Owners or Master to give every facility and assistance to carry out this inspection.

Clause 79    Change in Regulations
If the following circumstances affect the performance by Owners of this Charter, Charterers and
Owners shall discuss the situation in good faith to determine how each party bears the cost
incurred thereby:
(a)    When the existing laws and regulations that apply to this Charter contract have been
       changed or revised by the relevant authorities after the Charter-Party is signed;

(b)    When any new laws and regulations have come into force after the Charter-Party is signed.

Clause 80
Deleted.

- 10 -

ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
M/V "MEGALOHARI " - DATED LONDON, 2nd May, 2008

BIDSTED & CO. ⅔

Clause 81
Deleted.

Clause 82    Lay-Up
The Charterers shall have the option, after consultation with the Owners, of requiring the Owners
to lay up the vessel at an agreed safe port or place at any time during the currency of this Charter
but for less than four (4) months for the period of lay up.
Hire shall continue to be paid during any such period of lay up and any extra expenses incurred
by the Owners as a result of such lay up shall be reimbursed to the Owners by the Charterers.

Any amount which the Owners shall save or reasonably should save, having regard, inter alia, to
the envisaged length of the lay up period and the time of re-entry into service indicated by the
Charterers, during such period of lay up through reduction in expenses shall be credited against
hire paid or payable during the period of lay up.

Should the Charterers, having exercised the option granted hereunder, desire the vessel again to
be put into service, the Owners will, upon receipt of notice from the Charterers to such effect,
immediately take steps to restore the vessel to service as promptly as possible. However, in the
case of restoring the vessel for service, all costs thereby incurred, including the cost and expenses
for drydock if the vessel is obliged to be drydocked after such lay up, shall be borne by the
Charterers. Time used for such drydock to be counted on hire, and the cost for bunker oil
consumed during lay up period to be for the Charterers' account.

If the period of lay up exceeds 120 running days, the Charterers to accept the decreased service
speed and/or increased consumption due to lay up as well as underwater cleaning  painting at the
Charterers' expense and in their time.

Clause 83    Drydocking
Owners have the option to place the vessel in dry-docking at their expense during the currency of
this Charter at intervals of about 30 (thirty) months after the vessel's delivery or the vessel's last
drydocking, for bottom cleaning and painting and/or repair as required by class or dictated by
circumstances, provided, however, that Owners have the right to place the vessel in drydock at
any time in case of emergency. Charterers shall endeavour to bring the vessel at a port between
Japan and Singapore. Time shall be counted as off-hire from the day and at the place the vessel is
placed at the Owners' disposal as above indicated. Owners shall give 5 (five) months prior notice
to Charterers regarding the placing of the vessel in dry-dock.
Last drydock May 2007.

Clause 84    Long Stay
In the event of the vessel being ordered by the Charterers to stay or having eventually stayed in a
port or other place for more than 30 (thirty) consecutive days for some reason or other, which case
shall be differentiated from the lay up stipulated in Clause 67 hereof, the vessel will have to be
inspected for bottom fouling, if necessary. When any bottom fouling has been found and is
considered to be influential to the vessel's service speed and/or fuel consumption, the Owners
may have the right to provide underwater cleaning at Charterers' expense and in their time,
otherwise the Charterers shall accept a decreased service speed and/or increased fuel
consumption due to such a long stay until her next drydock.

- 11 -

ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
M/V "MEGALOHARI " - DATED LONDON, 2nd May, 2008

BIDSTED & CO. %

**Clause 85**
Deleted.

**Clause 86    Bunker Clause**
The Charterers on delivery and the Owners on redelivery, shall take over and pay for all fuel and
diesel oil on board the vessel as hereunder.

The Vessel shall be delivered with about 1,200-1,300 metric tons Intermediate Fuel Oil and about
60-70 metric tons Marine Diesel Oil.

The vessel shall be redelivered with about the same quantities as on delivery.

Prices both ends: U.S. $540.00 per metric ton for Intermediate Fuel Oil and U.S. $1,040.00 per
metric ton for Marine Diesel Oil.

The Charterers have the privilege of bunkering the vessel prior to her delivery, provided such
bunkering does not interfere with the Owners' operation. Similar privilege is granted to the
Owners prior to her redelivery.

**Clause 87    Stevedore Damage**
Vessel is guaranteed suitable for grab discharge, vessel has clear and unobstructed holds with no
deeptanks or other provisions except Australian hold ladders which to be adequately protected
against damages by grab discharge.

Master to notify in writing stevedores and all parties involved of any damage during loading
and/or discharging as soon as possible, in any case, latest before vessel's sailing. Master to
endeavour to obtain written acknowledgement by the party causing loss or damage.

Owners to try to settle damages directly with the party involved and Charterers to give his best
assistance in settling same and to remain ultimately responsible for such damage or loss that is
not compensated by the party involved in such stevedore damage.

Charterers have the privilege of using bulldozers in vessel's holds and any damages, except
normal wear and tear, caused by bulldozers to be considered as stevedores damage.

Damages affecting class to be repaired immediately and damages not affecting class and
postponed to dry-dock will be evaluated at the time of occurrence and Charterers to have the
option either to repair during such dry-dock or to reimburse as evaluated at the time of
occurrence.

**Clause 88    Cleaning of Holds**
Charterers have the option to employ the vessel's crew, that will render same assistance as to the
Owners, for intermediate cleaning between voyages, always subject to reasonable time is
available and when performed in port if permitted by local regulations.

ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
M/V "MEGALOHARI" - DATED LONDON, 2nd May, 2008

BIDSTED & CO. %

Vessel to have on board suitable equipment to perform such cleaning including but not limited to:
extendible ladders, hoisting equipment, water pressure lines in order to facilitate crew and
expedite operations. Charterers to pay Owners a lumpsum compensation for such intermediate
cleaning and per hold actually cleaned:
- U.S. $500.00 per hold for sweeping only,
- U.S. $600.00 per hold for sweeping / washing.

The Master and crew, although not responsible for the result of hold cleaning to render all
customary assistance with regard to hold cleaning and will provide sufficient equipment and men
to ensure that holds are cleaned without unnecessary delay.

See Clause 59 which defined / mentioned Hold Cleaning allowance additionally. The Clause shall
be applied in order, if applicable.

In case vessel's holds are rejected by competent authorities due to rust / rust scale / loose rust due
to lack of maintenance, time thereby lost to be off-hire and expenses thereby incurred to be for
Owners' account.

The Charterers shall have the option to redeliver the vessel with unclean / unswept holds against
a lumpsum payment of U.S. $6,000 in lieu of cleaning.

### Clause 89
Sea Waybill Clause to be applied but always subject to Head Owner's approval.

### Clause 90
Split Bill(s) of Lading Clause to be applied but always subject to Head Owner's approval.

### Clause 91
Charterers are allowed to add any off-hire time incurred during the currency of this charter party
to the maximum duration of this charter. This option shall be declared latest 60 days prior
redelivery.

### Clause 92    hold condition clause
Vessels holds on delivery or latest upon arrival first loading port to be ready to receive in all
respects Charterers intended cargo up to an independent surveyors satisfaction, failing which
vessel to be put off hire from time of failure until accepted by said surveyour and all time and
direct related expenses caused thereby to be for Owners account.

ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
M/V "MEGALOHARI " - DATED LONDON, 2nd May, 2008

BIDSTED & CO. %

WAR RISKS CLAUSE FOR TIME-CHARTERS, 1993
Code Name: "CONWARTIME 1993"

(1)  For the purpose of this Clause, the words :

    (a)  "Owners" shall include the Shipowners, Bareboat Charterers, Disponent Owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

    (b)  "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgment of the Master and/or the Owners may be dangerous or likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the Vessel.

(2)  The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgment of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(3)  The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and/or confiscation.

(4)  (a)  The Owners may effect war risk insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

    (b)  If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

(5)  If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined

- 14 -

ADDITIONAL CLAUSES TO THE CHARTER-PARTY OF
M/V "MEGALOHARI " - DATED LONDON, 2nd May, 2008

BIDSTED & CO. ⅍

by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by
the Charterers at the same time as the next payment of hire is due.

(6)    The vessel shall have liberty:-

(a)    to comply with all orders, directions, recommendations or advice as to departure, arrival,
routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo,
delivery, or in any other way whatsoever, which are given by the Government of the
Nation under whose flag the Vessel sails, or other Government to whose laws the Owners
are subject, or any other Government, body or group whatsoever acting with the power to
compel compliance with their orders or directions;

(b)    to comply with the order, directions or recommendations of any war risks underwriters
who have the authority to give the same under the terms of the war risks insurance;

(c)    to comply with the terms of any resolution of the Security Council of the United Nations,
any directives of the European Community, the effective orders of any other
Supranational body which has the right to issue and give the same, and with national
laws aimed at enforcing the same to which the Owners are subject, and to obey the orders
and directions of those who are charged with their enforcement;

(d)    to divert and discharge at any other port any cargo or part thereof which may render the
vessel liable to confiscation as a contraband carried;

(e)    to divert and call at any other port to change the crew or any part thereof or other persons
on board the vessel when there is reason to believe that they may be subject to
internment, imprisonment or other sanctions.

(7)    If in accordance with their rights under the foregoing provisions of this Clause, the Owners
shall refuse to proceed to the loading or discharging ports, or any one or more of them, they
shall immediately inform the Charterers. No cargo shall be discharged at any alternative port
without first giving the Charterers notice of the Owners' intention to do so and requesting
them to nominate a safe port for such discharge. Failing such nomination by the Charterers
within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo
at any safe port of their own choice.

(8)    If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is
done or not done, such shall not be deemed a deviation, but shall be considered as due
fulfillment of this Charter-Party.

- 15 -

5490



Seoul, Korea 13th June, 2008

ADDENDUM NO. 1

----------------------

to

---

MV. "MEGALOHARI" / D/S NORDEN, COPENHAGEN

CHARTER PARTY DATED 02ND MAY, 2008

----------------------------------------------

With reference to the captioned Charter Party, concluded by and between SHIPPING-LAND CO., LTD., as disponent Owners and D/S NORDEN, COPENHAGEN as Charterers, it is hereby mutually agreed that : -

This letter is to serve the purpose that we hereby authorize the Charterers, D/S NORDEN, COPENHAGEN, to remit all hires and monies due, or may come due under the referenced charter party to the following bank account :-

```
BANK        : WOORI BANK, SOSOMUN OPERATION TEAM
SWIFT CODE  : HVBKKRSE
BENEFICIARY : SHIPPING-LAND CO., LTD.
ACCOUNT NO. : 1081-800-380178
```

All other terms, conditions and exceptions of the above mentioned Charter Party to remain unaltered and full force.

For Owners :                                   For Charterers :

Ian Jo
2008. 06. 13.

10/11 '08 MON 14:11 FAX 37837309          SHIPPING-LAND                          ☒001

Seoul, Korea 27th Oct., 2008

### ADDENDUM NO.2

To

MV. "MEGALOHARI" / D/S NORDEN, COPENHAGEN
CHARTER PARTY DATED 02ND MAY, 2008

With reference to the captioned Charter Party, concluded by and between SHIPPING LAND CO., LTD., as disponent Owners and D/S NORDEN, COPENHAGEN as Charterers, it is hereby mutually agreed that : -

This letter is to serve the purpose that we hereby authorize the Charterers, D/S NORDEN, COPENHAGEN, to remit all hires and monies due, or may come due under the referenced charter party to the following bank account :-

BENEFICIARY : SHIPPING-LAND (SINGAPORE) PTE. LTD.

FOR ACCOUNT : THE KOREA EXCHANGE BANK, SEOSOMUN BRANCH, SEOUL KOREA

SWIFT CODE : KOEXKRSE

A/C NO. : 6 5 0 ~ 0 0 6 4 0 2 ~ 4 0 5

All other terms, conditions and exceptions of the above mentioned Charter party   to remain unaltered and full force.

For Owners :                                          For Charterers :

Ian Jo / BULK BIZ DEPT.

5490

# ORIGINAL

Seoul, Korea 02nd Dec., 2008

### ADDENDUM NO.3

To

MV. "MEGALOHARI" / D/S NORDEN, COPENHAGEN
CHARTER PARTY DATED 02ND MAY, 2008

With reference to the captioned Charter Party, concluded by and between SHIPPING-LAND CO.,
LTD., as disponent Owners and D/S NORDEN, COPENHAGEN as Charterers, it is hereby mutually
agreed that : -

This letter is to serve the purpose that we hereby authorize the Charterers, D/S NORDEN,
COPENHAGEN, to remit all hires and monies due, or may come due under the referenced charter
party to the following bank account :-

**BENEFICIARY : SPRING TECH CO., LTD.**

**FOR A/C : KOREA EXCHANGE BANK, SEOSOMUN BRANCH**

**SWIFT BIC : KOEXKRSE**

**A/C NO. : 6 5 0 – 0 0 6 7 9 0 – 2 4 2 (FOR USD)**

All other terms, conditions and exceptions of the above mentioned Charter party to remain unaltered
and full force.

For Owners :                                                For Charterers :

For and On Behalf of D/S NORDEN A/S
Strandvejen 52 Hellerup
Denmark



SHIPPING-LAND (SINGAPORE) PTE. LTD.

---

Shipping-Land Co., Ltd        Shipping-Land (Singapore) Pte. Ltd        D/S Norden, Copenhagen

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
MAKEBA MARINE CO.,                              :

                                Plaintiff,      :        08 Civ. 9376 (LBS)

        - against -                             :        ECF CASE

SHIPPING LAND CO., LTD., SHIPPING-LAND          :
CO. LTD., SHIPPING-LAND (SINGAPORE)             :
PTE. LTD., SHIPLAND CORPORATION PTE.            :
LTD. and DREAMSHIP PTE LTD.,                    :

                                Defendants.     :
-----------------------------------------------------------X

> **USDS SDNY**
> **DOCUMENT**
> **ELECTRONICALLY FILED**
> **DOC #:** _____
> **DATE FILED:** 2-4-09

## ORDER ON MOTION TO VACATE AND MOTION FOR COUNTERSECURITY

On January 15, 2009 the Court held a hearing pursuant to Supplemental Admiralty Rule

E(4)(f) on Defendant Shipping-Land Co. Ltd.'s motion pursuant to Supplemental Admiralty

Rule E(7) seeking countersecurity on its counterclaim and on Defendant Shipping-Land

(Singapore) Pte. Ltd.'s motion pursuant to Federal Rule 12(b)(6) to dismiss the Plaintiff's alter

ego liability claim against it as set forth in the Second Amended Verified Complaint and

pursuant to Supplemental Admiralty Rule E(4)(f) seeking vacatur of the ex parte maritime

attachment order issued as against it.

    For the reasons stated on the record at the hearing, it is hereby ORDERED that Shipping

Land (Singapore) Pte. Ltd.'s motion to dismiss/vacate is denied, and it is further ORDERED that

Shipping-Land Co. Ltd.'s motion for countersecurity is granted in the amount of $99,147.15,

without prejudice to its right to seek further countersecurity if Plaintiff obtains security in an

amount in excess of its principal claim.  Plaintiff is hereby ordered to post countersecurity within

10 days of the date of this Order.

Dated: February ___ 2009

_____
Hon. Leonard B. Sand
United States District Judge

**ATTORNEY VERIFICATION**

State of New York      )
                       ) ss.:
County of New York  )

MICHAEL E. UNGER, being duly sworn, deposes and says as follows:

1.      I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3.      The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
Michael E. Unger

Sworn to before me this
14th day of July, 2009.

_____
Notary Public

MELISSA COLFORD
Commissioner of Deeds
NYDOCS City of New York-No. 5-1692
Certificate Filed in New York
Commission Expires 4/1/10

16